SO ORDERED.

SIGNED this 13th day of January, 2017.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANASAS

| | |
|---|---|
| IN RE: | |
| TIAT CORPORATION, | Case No. 16-10764 |
| | Chapter 11 |
| Debtor. | |

## MEMORANDUM OPINION

Courts value the estate's interest in property in light of the purpose for establishing its value and the proposed use or disposition of the property.[1] TIAT operates the Inn at Tallgrass (the "Inn"), an extended-stay hotel that is encumbered by a mortgage securing SBNV's non-recourse claim filed in the amount of $4,596,648.50.[2] SBNV filed this motion for valuation under Fed. R. Bankr. P. 3012, proposing values up to $5.33 million.[3] In its plan, TIAT, proposed a value of

_____

[1] 11 U.S.C. § 506.
[2] Claim 7-1.
[3] Doc. 63.

1

$2,161,761. Neither proposal values the Inn in light of its anticipated use or disposition given its condition, historical performance, its competitive disadvantages, and the current local hotel market. SBNV's appraisal relies on speculative assumptions and optimistic projections. TIAT's report contains several calculation errors and relies on 10-month-old historical data. After reviewing all of the evidence, I conclude that the mode of valuation that best reflects what §506(a) requires here is a direct capitalization of the trailing twelve months' (TTM) net operating income, as adjusted for average historical operating expenses, at a capitalization rate of 10.8 percent. That yields a value for the Inn at Tallgrass of $1,956,000 for plan confirmation purposes. SBNV's secured claim should be allowed in that amount.[4]

Facts

The Inn at Tallgrass

The Inn was built in 1985 (with additional buildings in 1990). It is a campus-style, limited service, extended-stay hotel consisting of several buildings with 88 total units (suites with full kitchens except for 24 studio-type units) with exterior door entrances and stair wells. It is an independent hotel carrying no brand or flag affiliation and no national reservation system. It is located near, but not visible from, the intersection of North Rock Road and 21st Street East, a busy retail and residential location in Wichita's northeast quadrant. The Inn is tucked behind a shopping center and is adjacent to a private golf club. The Inn typically caters to corporate customers who provide extended stay lodging there for their employees.

---

[4] TIAT Corporation appears by its debtor-in-possession counsel Mark J. Lazzo. Creditor SBNV ITG LLC (SBNV) appears by its counsel Eric W. Lomas.

2

These customers include the major aircraft manufacturers and Koch Industries which is headquartered in Wichita. Without a flag, the management must build and maintain relationships in the community to directly sell the Inn's extended stay concept to customers and corporate travel departments. The Inn is considered a mid-price hotel that appeals to cost-conscious guests. Everyone agrees that the hotel has deferred maintenance and needs a "soft finish," the general updating of furnishings and decor.

Donald Kennedy acquired sole ownership of the capital stock of TIAT in 2006 for $6.1 million. To finance that purchase, TIAT borrowed $5.0 million from U.S. Bank on a non-recourse note secured by, among other things, a mortgage on the property and an assignment of room rents. Previously, Kennedy had managed the Inn since 1987. He currently receives an annual salary of $110,000 and continues to manage the hotel. After a substantial drop in revenue in 2015 led to default and a looming foreclosure, TIAT filed this case. TIAT attributes its misfortune to a decline in corporate customers purchasing extended stay housing for their employees as a result of increased competition in Wichita. Post-petition, U.S. Bank auctioned TIAT's note and mortgage and SBNV, the current holder, acquired it for $1.82 million. TIAT filed a plan proposing to value the Inn at $2,161,761 and SBNV filed this motion under § 506(a) to determine the value of the collateral.[5] The Court conducted an evidentiary hearing on December 6, 2016.

<u>The Valuation Reports and Experts</u>

---

[5] TIAT's plan was amended on October 19, 2016, but the proposed value of SBNV's collateral remains $2.16 million. *See* Doc. 154.

3

Three reports were offered and admitted into evidence. The debtor offered two opinions of James Korroch, the first asserting a value of $2,181,761 and the second a revised value of $1,298,364.[6] The debtor also offered as evidence an appraisal procured by U.S. Bank as it prepared for the auction and authored by CBRE, suggesting a value of $2.2 million as of November of 2015.[7] SBNV offered the expert opinions of James Askew of Hotel Valuation Advisors which assert a value of $5.33 million.[8] Askew also prepared a rebuttal report to Korroch's initial opinion.[9] Korroch and Askew testified at trial; neither party called anyone from CBRE to testify.[10]

James Askew is a licensed commercial real estate appraiser and has been president of Hotel Valuation Advisors, Inc. since 2000. He specializes in hotel valuations and has appraised more than 500 hotels of varying types, including independent properties and extended stay hotels all over the United States. Askew's report relies heavily on industry market data and trend reports compiled by third party services such as Smith Travel Research (STR), the Highland Group, and PKF to develop projected growth, revenue, and operating expenses for the Inn.

TIAT asked James Korroch, a personal friend of Mr. Kennedy, to advise it concerning the value of the property. Korroch is not a licensed appraiser, but he has been a licensed commercial real estate agent for about two years. Before that, he

---

[6] Ex. B and Ex. I-1.
[7] Ex. D.
[8] Ex. 1.
[9] Ex. 3.
[10] A fourth report by Martens Companies, authored by Lee Whyte in 2013, was also admitted, indicating a value of over $6 million. This report's age limits its usefulness for § 506 purposes.

4

accumulated nearly 30 years' experience as a hotelier, serving in various capacities. He co-founded Candlewood Suites with extended-stay lodging pioneer Jack DeBoer, and worked to develop nearly 70 Candlewoods before DeBoer sold the brand. His roles included management, site selection, and franchising. Korroch is also a Marriott franchisee and has developed several Marriott properties in the Midwest. He presently owns the Marriott Fairfield Inn in east Wichita and two other Marriott properties in Northwest Arkansas. He specializes in consulting with investors wanting to build or purchase hotels and is currently advising the developers of the newly-constructed Starwood aLoft property in northeast Wichita, a $20,000,000 project. Korroch's lack of appraisal certification is offset by his credibility and experience with hotel operations, and specifically with extended stay hotels in the Wichita market. He testified that he was familiar with and uses capitalization methods in evaluating hotels for himself and his clients.

Summary of Appraisals

The debtor's plan proposes a value for the Inn of $2,161,761.[11] SBNV advocates a much greater value range, $5,200,000 to $5,330,000 depending upon which method its appraiser uses. After SBNV filed a motion to exclude Korroch's initial opinion and Askew issued a "rebuttal" report pointing out various flaws in it, Korroch issued a revision, admitted as Exhibit I-1, reducing his value estimate to $1,289,384. Also in evidence is another licensed appraiser's report, that of CBRE Hotels as of November 24, 2015. CBRE made this appraisal for LNR Partners, a distressed assets servicer

---

[11] See Doc. 154, p. 5 (First Amended Plan dated October 19, 2016). See also Ex. B (Korroch's report valuing the Inn at $2,181,761).

5

for U.S. Bank, the former holder of the U.S. Bank debt. CBRE estimates the value of the hotel at $2,200,000. No CBRE appraiser testified.[12] The range of values is displayed in the following table.

| | Yield Cap Income Value | Direct Cap Income Value | Comparable Sales Value | Trial Testimony |
|---|---|---|---|---|
| Askew SBNV[13] | $5,330,000 | $5,200,000 Cap rate 10% | $5,280,000 | $5,166,755[14] |
| Korroch TIAT[15] | —— | $2,181,761 Cap rate 13.8% | —— | —— |
| Korroch TIAT[16] | —— | $1,298,364 Cap rate 10.8% | —— | $851,703[17] |
| CBRE[18] Appraisal | —— | $2,200,000 Cap rate 11% | $2,300,000 | —— |

[12] Recognizing that Mr. Korroch is not a licensed appraiser, we nevertheless refer to the value witnesses as "appraisers" for convenience.

[13] Ex. 1 - Valuation date of July 20, 2016. A discount rate of 10.75% was applied to calculate the present value of cash flow under the yield capitalization methodology.

[14] On rebuttal, Askew testified that Korroch's direct capitalization calculation was erroneous because Korroch did not use the most recent TTM ending October of 2016 ($1,843,375), did not apply market based operating expenses extrapolated from the comparable Marriott sale ($1,263,298) and did not use the Marriott sale cap rate of 9.8%. A proper direct cap calculation using these variables and a 4% replacement reserve yields a value of $5,166,755.

[15] Ex. B – Valuation date of April 14, 2016.

[16] Ex. I-1 – Revised valuation date of December 2, 2016.

[17] On questioning from the Court, Korroch acknowledged that he failed to use the NOI figure from the TTM ending October of 2016 in his revised December valuation and that a more accurate estimate of value could be gleaned using this TTM of net operating income. The Court's calculation applying Korroch's methodology to the TTM ending October of 2016 results in a lower net operating income and a direct capitalization calculation as follows: $165,719 NOI - $73,735 (4% replacement reserve) = $91,984 adjusted NOI ÷ 10.8% cap rate = a value of $851,703.

[18] Ex. D – Valuation as of November 24, 2015.

6

<u>Comparison of Appraisal Reports and Conclusions</u>

### *Deferred Maintenance*

Both Askew and Korroch purport to value The Inn on an "as is" basis. Both also agree that some level of property improvement is necessary. Askew factored a $600,000 improvement plan into his calculations and Korroch testified that a similar program would be necessary to keep the hotel in its current competitive position. Korroch testified that in his experience, hotels require periodic "soft finish refreshes," meaning that the furnishings, carpeting, wall coverings, and window treatments need to be refreshed at least every 6 years. This property requires that, too.

### *Competitive Conditions*

Each appraiser recognized the influx of new hotel properties into the Northeast Wichita market. Their views of how those new rooms compete with the Inn are divergent. Korroch noted that six new properties located within a few miles of the Inn will come online in 2017 or 2018. Askew estimated an additional 428 rooms would be provided by those properties. All of the new properties are flag properties and, unlike the Inn, are single building hotels with interior hallways. Korroch argued that lenders and buyers prefer flag properties because of their access to reservation systems, corporate property support, and management. Askew concurred that flag properties have advantages, but argued that the Inn's freedom from franchise and management fees made up for the lack of franchise connections. They agreed that big box properties are more attractive to corporate customers because they are more up to date and secure. Korroch noted that by 2020, nearly 80% of all travelers will be

7

"millennials" who want smaller rooms and larger common areas where they can "meet and greet." The Inn features larger guest rooms in the lodging buildings, but lacks interior halls and only has a small eating area in the separate registration/lobby building.

Askew's report recognizes that the Inn suffers from certain competitive disadvantages. To begin with, he notes that nationally, growth in average daily rent (ADR) as well as revenue per available room (RevPAR) will slow in the next several years.[19] In addition, he notes that "US hotel occupancy is … no longer growing robustly." Occupancy is defined as the percentage of available rooms that are actually rented. Accordingly, as occupancy levels off, either RevPAR or ADR will, too, because RevPAR is the product of occupancy and ADR.[20] Askew's report quotes other sources to the effect that extended stay hotels in the "mid-price" range will enjoy only flat to moderate growth over the next several years and that the growth is expected to lose momentum.[21]

Local pressures also weigh down the Inn's competitive advantage. Askew noted that there were 123 hotels in Wichita in April of 2016 and that occupancy was down (2.6)% year over year, driving RevPAR down (0.5)%. He selected a set of comparative properties that, while of similar size, are structurally and physically different from the Inn. Their RevPAR was down in 2016 some (2.2)%; occupancy dropped and the increase in ADR declined as well. Notably, the Inn's RevPAR had increased some in

---

[19] Ex. 1, p. 58.
[20] RevPAR is the gross revenue per available room; ADR is the gross revenue per rooms sold.
[21] Ex. 1, p. 61.

8

2015, largely due to an increase in ADR that countered its loss in occupancy and attendant reduced cash flow.

Even so, Askew argued that the coming new hotel rooms wouldn't compete with the Inn because they would command a higher price point that would appeal to a different client set. He noted that, until 2015, the Inn had enjoyed higher RevPAR than other hotels in the area. Korroch countered that in a smaller market like Wichita, any added hotel rooms pose a challenge to existing assets. He described the local market as "tight" and "close," noting that the all of the properties "steal" customers from one another. He also noted that the Inn's off-street location, when compared to the newer competitors who were or will be situated at highway interchanges or busy intersections, remained a negative.

Askew suggested that even though the national and local markets' growth is declining, after renovation, and with significantly reduced expenses, the Inn's projected average daily rents would increase by more than 3% a year over a long period, making the Inn appear to be worth much more than either Korroch or CBRE thought. Korroch agrees that demand growth is cooling and suggested that the Inn's competitive disadvantages warranted increasing any capitalization rate he might establish by 100 basis points for risk.

### *Other Considerations*

To be sure, both witnesses faced several challenges. The Inn's accountings don't correspond to traditional hotel cost centers. None of the witnesses was provided with detailed income and expense reports. In addition, the Inn's gross revenues were

9

fairly stable from 2012 to 2014, averaging about $2.118 million per year. But in 2015 gross revenue plummeted to $1.665 million, a 21.4% drop. The TTM gross revenue from November of 2015 to October of 2016 rebounded to $1.843 million, a 10% increase.

### Method Selection

Korroch and Askew took different approaches to valuing the property. CBRE and Askew capitalized stabilized income while Korroch capitalized historical income and expenses for the trailing twelve months (TTM) preceding his reports. Where Askew advocated the use of "yield capitalization," CBRE and Korroch employed "direct capitalization." Briefly, yield capitalization involves projecting future net operating income (NOI) a property might generate over time, discounting that NOI back to present day by applying a discount rate, applying a cap rate derived from market data to that NOI, and deducting the cost of any improvements from the result. Direct capitalization involves determining the stabilized revenue and operating expenses for a property, based upon its history or the market, and applying a cap rate to the resulting NOI. [22]

Askew testified that yield analysis is most appropriate for properties with single tenant usage or long term leases. He said that smaller owner operators prefer using direct capitalization because it generally reflects historical performance rather than projected performance. Korroch said that in his "community" – hotel buyers and

---

[22] *See In re Whitney Lane Holdings, LLC,* 2009 WL 2045700 at *7 (Bankr. E.D. N.Y. July 6, 2009) explaining the difference between the yield capitalization method and the direct capitalization method in valuing a shopping center.

10

Marriott operators -- buyers look at TTM data and capitalize it rather than rely on the projections that undergird yield analysis. He stated that yield capitalization is typically used in the hotel business when prospective buyers are REITs or when entities are considering whether to construct a hotel.

The Opinions

Both Askew and Korroch agreed that renovations of at least $600,000 are needed. TIAT's plan does not provide for these renovations, but proposes to make some renovations as cash flow allows. They agreed that it was appropriate to deduct a 4% replacement reserve before capitalizing the Inn's net income. Both concluded that the highest and best use of the property is continued operation of the hotel. Both concluded that the gross revenue figure for year 2015 was an anomaly and have disregarded year 2015 results in their value calculations. Finally, both concluded that the cost approach was not an appropriate valuation method given the Inn's age. They considered the sales comparison approach, both to extract capitalization rates and to check their income-based value results. Although Korroch only considered a single comparable sale, the extended stay Marriott Town Place Suites (Marriott), all ten properties in Askew's comparative set are affiliated or branded hotels, not an independent hotel like the Inn.

### Askew's Appraisal

Askew's $5.330 million opinion of value is derived from a yield capitalization of ten years' projected stabilized NOI. It assumes a $600,000 renovation in the first year. He chose the yield capitalization method because the Inn's NOI is not

stabilized. That requires him to project income and operating expenses in the future to derive a stabilized NOI.

Askew emphasized several positive factors to the property. They include the Inn's presence in a "desirable neighborhood," near major commercial and retail development and close access to arterial highways. He projects that executing a $600,000 property improvement plan would add 20-25 years of useful life for the hotel.[23] He noted that even without a brand affiliation, the Inn's RevPAR outpaced the market during most of 2012-2016. But in 2015, the Inn experienced a significant drop in occupancy, declining some 16 percent, and attendant gross revenue. Note that this drop in occupancy occurred during the year when the Inn increased its ADR nearly $4.00 over the prior year, to $89.78. But after 2015's disappointing results, ADR dropped to its pre-2015 rate. 2015 was a weak point in an otherwise strong set of performance numbers and the hotel's gross revenue has rebounded in 2016 with a TTM ending October of 2016 of $1.843 million. This TTM revenue still lags roughly $200,000-$300,000 behind years 2012-2014.

But, Askew also projected a drop in market RevPAR of -2.2% and a drop in occupancy of -3.9% for 2016. What makes Askew's appraisal report less persuasive are his observations about this hotel and this submarket. He acknowledges the increasing market supply of hotel rooms in Wichita, noting that 482 new rooms will come online in the near future. But he concludes that these incoming competitors won't negatively affect the Inn because of their higher room rates. Still, several of

---

[23] Askew testified that the average economic life of a hotel is 50 years.

these hotels are located close to the Inn. One such hotel in development, the Starwood aLoft, is across the street from Koch Industries' headquarters. Koch has been one of the Inn's principal customers.

Askew also concluded that the Inn's operating expenses exceed average operating expenses of the hotel market in general, including those of the Marriott, Korroch's only comparable sale. Askew projects a future operating expense reduction of at least 20 percent from the Inn's actual historical operating expenses. This decrease alone adds about $400,000 to NOI, in turn triggering a $3.7 million dollar market value swing, despite Askew's testimony that he didn't know whether reducing expenses would lead to decreased revenues.[24]

Askew projected a 3.15% ADR increase for years 4 through 11 notwithstanding flat occupancy in his stabilized projections. He chose the yield capitalization income method because it is said to adjust for variable revenue streams by normalizing and discounting them. He relied on three local comparable sales to support his $5.3 million value. Each sold for between $68,000 and $98,000 per unit or room. By comparison, at $5.3 million, the Inn would bring $60,000 per unit. Each of Askew's comparable sales involve newer, branded, big box hotels. They include Korroch's only comparable sale, the Marriott. The other two are not extended-stay hotels and none of the three is a campus style property like the Inn.

Askew testified that smaller hotel owner-operators use the direct capitalization method when they buy because they don't trust the yield capitalization

---

[24] $400,000 ÷ 10.8\% = \$3,703,703$.

method. It is too speculative or reliant on predictions. He also said that yield capitalization is typically employed in pricing properties with predictable space usage like single tenant usage or long-term leases such as office buildings, retail centers, and other properties. Askew also said that selecting the appropriate capitalization rate involves considering the site location, the condition and design of the property, and competition in the area even though his rebuttal report questioned Korroch's adjustment of the Marriott capitalization rate based on precisely these factors.

Using direct capitalization, Askew established an alternative $5.2 million value to the Inn by applying a 10 percent capitalization rate. As with his yield capitalization analysis, Askew's NOI projection is much higher because he applied market average operating expenses in assuming that the Inn's actual operating expenses can be stabilized at approximately 78.1% of gross revenue (before reserves). The Inn's actual operating expenses were as much as 99% of gross revenue in 2015, the final full year before filing, and were never lower than 85% (2013) in any year between 2012 and 2016. Using market numbers, he opines that the Inn's stabilized NOI is approximately $537,000. Note that the Inn's actual current trailing twelve months' NOI figure (through October 2016) is $165,719 (before replacement reserve). As he noted on cross-examination, the market expense averages are calculated based on hundreds of hotels, only a few of which may be similar to the Inn.

Testifying on rebuttal, Askew responded to Korroch's corrected direct capitalization evaluation[25] arguing that Korroch should have used the latest

---

[25] Ex. I-1.

available TTM numbers ending October 2016, not the TTM ending in March of 2016.[26]

He also maintained that Korroch should have applied operating expenses similar to those recorded for the comparable Marriott sale in 2015, as market-based expenses. He extrapolated the Marriott's operating expenses by deducting from gross revenue the adjusted NOI (adding back replacement reserve) yielding $1.177 million and dividing that by 82 rooms to yield operating expense of $14,356 per room. Applying that per room expenses figure to the Inn (a much older and different set of buildings), he multiplied that amount by 88 rooms, yielding $1,263,298 in operating expense and subtracted it from the Inn's current TTM gross revenue of $1,843,375, subtracted another $73,735 for a 4% replacement reserve, leaving the Inn's adjusted 2016 NOI at $506,342. Capitalized at 9.8% (the Marriott's capitalization rate), this yields a direct capitalization value of $5.166 million.

Askew concluded that a reasonable investor would bid assuming that the Inn's operating expenses could be normalized to market averages. It is true that the Inn falls at the high end of the expense range of the hotel market, $11,593 - $19,757 per unit.[27] Its TTM current operating expenses are $19,788 per unit and have been as high as $21,000 per unit. The ratio of operating expenses to the Inn's gross revenue has historically averaged about 88.39% during years 2012-14; that's ten points higher than Askew's 78.1% at which he purports to stabilize the Inn's operating expenses.

---

[26] The Court notes that Korroch's initial valuation was made in April of 2016, when the most recent TTM available to him ended in March 2016. Korroch admitted that he neglected to change the TTM period when he revised his report in late November of 2016 and acknowledged that the TTM ending October 2016 was the more appropriate TTM period.

[27] Ex. 1, p. 82.

15

Askew's opinions hinge on revamping and reducing the expense structure in a short period of time without negatively affecting occupancy and revenue.

### *Korroch's Value Opinions*

Korroch stated that the Wichita hotel business here is extremely close and competitive. He recently acted as buyer's broker for the sale of the Marriott Town Place Suites property and believed it was the most comparable sale from which to extract a capitalization rate. The Marriott and the Inn regularly compete for the same customers. He based his opinions on the financial information Kennedy provided him. When he issued his April opinion of value at $2,181,761, he included the TTM revenue and expenses ending March, 2016 to establish the NOI of $298,000 that he capitalized at 13.8%. Korroch's assumptions about the Marriott sale were erroneous because he'd used its 2014 results to establish its NOI rather than 2015. There were arithmetic errors in the opinion as well. Plus, he assumed that the Inn paid a franchise and management fee. It pays neither. Instead, Kennedy receives a salary that is accounted for in general and administrative expenses.

When SBNV pointed out those errors in its motion in limine in December of 2016, he revised the opinion.[28] But his calculations were still based on the TTM ending March of 2016. The corrections he made to the Marriott numbers drove the cap rate in that sale down to 9.8%. Because of the Inn's competitive disadvantages previously discussed, Korroch adjusted that rate up 100 basis points for risk. These corrections dropped his NOI estimate to $140,223, which, capitalized at 10.8%,

---

[28] Exhibit I-1.

16

yielded a value of $1.298 million. Korroch testified that a more accurate estimate could be gleaned by using the latest available TTM, the October 2016 numbers.[29]

### CBRE 2015 Appraisal

CBRE established a direct capitalization value of $2.2 million for the Inn that is based on a stabilized NOI of $282,650,[30] as opposed to Askew's projected $537,000 NOI. Expenses were stabilized at 79.3% of gross revenue and CBRE's income projections are significantly lower than Askew's. It's important to note that the CBRE appraisal report is dated January 31, 2016, shortly after TIAT's worst revenue year in the past five. Because CBRE's appraiser was not called to testify, we cannot determine how recent revenue developments might bear on this opinion of value.

We turn to determining which of these methods and outcomes best "fits" what 11 U.S.C. § 506(a) contemplates: determining the value of SBNV's interest in the debtor's interest in the property in light of the purpose of the valuation (allowance of SBNV's secured claim and plan confirmation) and the proposed use or disposition of the property (retain, refurbish, and continue to operate as a hotel).

---

[29] This would drive the value down to $851,703, *see* note 17, *supra,* due to the Inn's even higher-than-normal operating expense ratio of 94% during this TTM (1,741,424 expenses ÷ 1,843,375 revenue).  If the Marriott's capitalization rate of 9.8% were applied to the October 2016 TTM as Askew contends, the calculations would yield a value for the Inn of $938,612 ($91,984 ÷ .098), well below Askew's own direct capitalization value of $5.2 million. The major difference again lies in the operating expense numbers – with Askew attempting to normalize the Inn's actual operating expenses to market-based expenses, while Korroch utilizes the Inn's historical, actual operating expenses.
[30] Ex. D.

<u>Analysis</u>

Proper application of § 506(a)(1) requires that the value of the Inn be determined as of the hearing date and as it exists ("as is") today, since TIAT intends to retain the property, continue to operate it as a hotel, and use the income from operations to fund its plan of reorganization.[31] As confirmation time is near, the value determined here will drive the amount of SBNV's allowed secured claim.[32]

While fully crediting the experience and technical expertise both value witnesses brought to this hearing, the Court believes that even the best appraisals are, to some degree, educated guesses about the value of the property. Where the value experts land is often a function of the methods they apply and the data to which they apply them. Here, the parties have presented two competing appraisals with values ranging from Korroch's opinion of value of $1,298,364 to Askew's appraisal of $5,330,000. I am not required to simply choose one or the other.[33] As another bankruptcy court has noted –

---

[31] *See In re Heritage Highgate, Inc.,* 679 F.3d 132, 142-43 (3rd Cir. 2012) (Section 506(a) valuation of collateral to determine treatment of claim by plan as secured or unsecured, must be compatible with the values on date of confirmation); *In re Stanley,* 185 B.R. 417, 423-24 (Bankr. D. Conn. 1995) (same); *Matter of Seip,* 116 B.R. 709 (Bankr. D. Neb. 1990) (valuing collateral in proximity to confirmation date where determining amount of creditor's allowed secured claim); *In re Hotel Associates, L.L.C.,* 340 B.R. 554 (Bankr. D. S.C. 2006) (court only considered direct capitalization "as is" valuation rather than "at stabilization," where "as is" value represents a value for hotel that is closest to the date of the hearing.).

[32] SBNV may elect to be treated as fully secured under § 1111(b)(2)(B). Should that occur, the value determined today will set the present value that debtor's stream of payments must have while paying SBNV as if it were fully secured at $4.5 million.

[33] *See In re Patterson,* 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007) (Because of subjective nature of appraisal process, bankruptcy court is given wide latitude in determining value and is not bound by values determined by appraisals and may form its own opinion as to value after consideration of the experts' testimony and appraisals.); *Accord, In re Hernandez,* 493 B.R. 46, 50 (Bankr. N.D. Ill. 2013); *In re American HomePatient, Inc.,* 298

18

The Court may accept an appraisal in its entirety or may choose to give weight only to those portions of an appraisal that assist the Court in its determination. *See, In re Brown,* 289 B.R. 235, 238 (Bankr.M.D.Fla.2003). "[W]hen competing appraisals are submitted, the court is required to consider portions of each to arrive at what it believes to be a realistic market value for the property." *In re Belmont Realty Corp.,* 113 B.R. 118, 121 (Bankr.D.R.I.1990). Heightened scrutiny is appropriate when two competent appraisals are presented by qualified appraisers stating widely divergent values. *See In re Grind Coffee & Nosh, L.L.C.,* 2011 WL 1301357 (Bankr.S.D.Miss.2011). Based on the above, it is clear that the Court is not required to adopt one competing appraisal or the other, but may instead form its own opinion of the property value after considering the evidence presented.[34]

Accordingly, I can give such weight to those portions of each appraisal that enable me to reach a determination of the Inn's fair market value while disregarding those portions that I find less persuasive.

Section 506(a) doesn't impose a specific standard or method of valuation, but several courts have considered what methods of valuation are appropriate in hotel cases.[35] In *In re 210 Ludlow Street Corp.,* the Court held that the income capitalization method was appropriate, while commenting that one expert's value was based on unrealistic growth assumptions concerning occupancy.[36] Typically,

---

B.R. 152, 173 (Bankr. M.D. Tenn. 2003); *In re Braun,* 2014 WL 5334733 at *6 (9th Cir. BAP Oct. 20, 2014) (no error when selecting a value within the range presented by the evidence).

[34] *In re 210 Ludlow Street Corp.,* 455 B.R. 443, 448 (Bankr. W.D. Pa. 2011) (the court arrived at a value between debtor's and creditor's experts).

[35] *See In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 73-74 (1st Cir. 1995) (Section 506(a) gives bankruptcy court flexibility to choose standard of valuation to fit the circumstances of the case before it; affirming fair market value of collateral rather than liquidation value where chapter 11 debtor proposes to retain and use the collateral.); *In re 210 Ludlow Street Corp.,* 455 B.R. at 447 (the bankruptcy court has wide latitude in determining the value of property in bankruptcy proceedings).

[36] 455 B.R. 443, 449 (Bankr. W.D. Pa. 2011). *See also In re Hotel Associates, L.L.C.,* 340 B.R. 554, 557 (Bankr. D. S.C. 2006) (describing income capitalization approach comprised of the direct capitalization method and the yield capitalization method (also known as the discounted cash flow method).

appraisers applying the income method of valuing real property seek to determine a "stabilized" rate of income. Income is said to be stabilized when "abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the property."[37] Each appraiser attempted to "stabilize" the Inn's income and expenses in different ways as discussed above. Where the "stabilized" income and expenses are projected as Askew did, the persuasiveness of conclusions hangs on the assumptions upon which they are based. The further the assumptions get from actual historical experience, the more speculative the results become. Both Askew and Korroch employ an income capitalization approach, but Askew used the yield capitalization method while Korroch used direct capitalization. In explaining the difference in the two methods, one court particularly criticized an appraiser's use of yield capitalization, noting that—

> Under [the "direct capitalization method"], . . . the estimate of single year's income expectancy at a projected stabilized income level, or an annual average of several year's income expectancies, is converted into an estimate of value by dividing that figure by an overall capitalization rate.
>
> * * *
>
> In contrast, in the ["yield capitalization method"], the annual cash flow and sale proceeds over a typical holding period are converted into a value estimate by discounting to present value. This method is based upon earnings projections over a longer period of time and the predicted value can vary greatly depending upon the discount rate used.[38]

---

[38] *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 310-11 (Bankr.C.D.Ill.2003).

The *210 Ludlow* court called the direct capitalization of income method the "default method" for determining value under an income approach while stating that yield capitalization is "generally restricted to use only in cases where there is an unstable market or where new construction is involved."[39]  Indeed, Mr. Askew and Mr. Korroch each testified that yield capitalization is most appropriate in situations involving properties that are subject to long-term leases that are predictable.[40] Whether and how to apply it are prudential matters for the appraiser's judgment. The yield capitalization analysis offered in this case involves several sets of assumptions (increasing income, decreasing expenses, appropriate discount rate, and cap rate) and thus assumes many "facts" that are not in evidence. The factors and trends that the Askew appraisal relied on do not reflect today's hotel market in this community. Section 506's focus is on the here and now, not the when and if. I decline to apply the yield capitalization method to the Inn in its present condition in this increasingly competitive marketplace. Instead, the direct capitalization of the Inn's net operating income is likely to be the best indicator of its fair market value as an income producing asset today. But what income stream is appropriate?

Nearly all of the wide delta between Korroch's direct capitalization at $1,289,364[41] and Askew's direct capitalization value of $5.2 million[42] can be

---

[39] 455 B.R. 443, 449.

[40] *See In re Vienna Park Properties,* 132 B.R. 517 (Bankr. S.D. N.Y. 1991) (appraiser properly used direct capitalization method to value apartment complex where the property was subject to *one-year* leases with lack of certainty of rental rates, occupancy, and inflation over prolonged projected period and where property required significant repairs.).

[41] Exhibit I-1.

[42] Exhibit 1, p. 88.

explained by Askew's adjustment of the Inn's historical operating expenses to what he terms "market-based" expenses, *i.e.* industry averages for a hotel's various cost centers. This adds more than $300,000 to NOI. The evidence suggests that the Inn's operating expenses are substantially higher than the hotel industry averages as compiled from market data submitted by hotels to third party services.[43] But, the market data is not limited to campus style extended stay hotels. It includes different ages of hotels, different ADR and price point classifications, and flagged or affiliated hotels rather than independent hotels. The three data reporting services, HOST 2015, PKF, and Highland Group, report average hotel operating expenses in 2015 of $14,978, $19,757 and $11,593 per room respectively, whereas the Inn's reported per room expenses for years 2013, 2014, and 2015 were $18,906, $18,302, and $18,715 respectively.[44] The average of reported hotel operating expenses in 2015 by the three market data services is $15,443 while the average of TIAT's actual operating expenses for years 2013-2015 is $18,641, a difference of $3,198 per room or 17.1%.

Askew's projected future operating expenses in forecast year 1 are $15,192, a significant cut. Askew says the bulk of that should come from labor costs. But this discounts the lack of a national reservation system and brand marketing. Without that, the Inn must work to develop personal relationships with corporate and business demand generators – a sales and labor intensive approach to generate occupancy and room revenue that is certainly not cost-free. Moreover, even during

---

[43] *See* Ex. 1, p. 82 of Askew's Appraisal Report showing market data compiled by three such services: HOST 2015 [*i.e.* STR – Smith Travel Research], PKF, and Highland Group.
[44] Each of these numbers is calculated per room.

years 2012-2014 when NOI was relatively stable, the Inn's operating expenses ran above industry norms, averaging 88.39 percent of gross revenue and never below 85 percent of gross revenue in any of those three years. It may simply cost more to run an old hotel. Expenses cannot be immediately reduced by nearly 17% without negatively affecting the quality of service and, in turn, reducing gross revenues, particularly in the current competitive environment.[45]

As Korroch suggested, a stabilized income stream that reflects the hotel's historical performance is more likely what a buyer might use to determine what to bid for this hotel. His opinion was based on the TTM ending in March of 2016 (the "March TTM"). He testified that use of the TTM ending in October 2016 (the "October TTM)" would have been timelier. If § 506(a) valuation is to be done as of the date of the hearing, the October TTM is the appropriate place to start. Rather than apply Askew's market average expenses, I would deduct expenses of 88% of gross revenue, the operating expenses average for the years 2012, 2013, and 2014, a far more stable period in the hotel's history than 2015 or 2016. Because the debtor books depreciation as an operating expense, depreciation should be added back to net income and a replacement reserve of 4% be subtracted before determining NOI. This calculation is shown below:

---

[45] Remember that we are not making a feasibility determination at this time. Reduction of current expenses may be necessary to demonstrate that a plan can be confirmed.

Case 16-10764    Doc# 213    Filed 01/13/17    Page 23 of 25

| | |
|---|---|
| October TTM Gross Revenue | $1,843,375 |
| (Expenses at 88% of Gross) | ($1,622,170) |
| Net Income | $ 221,205 |
| Add back depreciation[46] | $ 63,768 |
| Adjusted NOI before reserves | $284,973 |
| (4% Replacement Reserve) | ($73,735) |
| NOI | $211,238 |

Korroch and Askew also differed on appropriate capitalization rates for the direct cap calculation. As noted in *In re Hotel Associates, L.L.C.,* the capitalization rate is "dictated by market forces and the prospective investor's perceived risk in investing in or purchasing a given property."[47] As risk rises, so does the capitalization rate. Korroch credibly testified to the risk factors he considered in adjusting the rate he calculated from the Marriott Town Place Suites sale up 100 basis points. As discussed above, he noted that the Inn is fifteen years older than the Marriott, is in an "inferior" location, and, unlike the Marriott, is unaffiliated and unbranded. The upward adjustment is further justified by the increasing competition in the Wichita hotel market due to 482 new rooms coming online soon, the overall national market

---

[46] Depreciation for the TTM ending October 2016 is substantially less than in prior years (*e.g.*, $63,768 v. $200,497 in 2015), *see* Exhibit F. But Exhibit G shows monthly depreciation of $-0- after March of 2016, coincidentally when the debtor's accountant, Allen Gibbs & Houlik, stopped keeping the books. After that, the debtor maintained the books in-house on Quicken.

[47] 340 B.R. 554, 557.

decline in RevPAR and ADR growth, and the fact that the Inn is not successfully replacing corporate demand generators that it has lost.

<u>Conclusion</u>

Applying the 10.8% cap rate to the stabilized NOI for the twelve months trailing as of the end of October, 2016, I conclude that the fair market value of the Inn, as is, is **$1,956,000**.[48] This value shall control for confirmation and secured claim allowance purposes.

As previously ordered, SBNV has 14 days from the date of this order to make a § 1111(b) election.[49] Likewise, TIAT has 14 days from the date of this order to amend its plan to reflect the value determined today. The status conference scheduled for January 19, 2017 at 11:00 a.m. remains set.

# # #

---

[48] $211,238 ÷ 10.8% = $1,955,907.
[49] Doc. 167.